## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG GALAXY S10, CURRENTLY IN DEA CUSTODY IN BANGOR, MAINE | No. 1:24-mj-00111-JCN |
| | **FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is described in Attachment A and currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008.  I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c).  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections

841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to search the device described in Attachment A for evidence of these crimes, as described in Attachment B.

## ITEMS TO BE SEARCHED

5.      I seek a warrant to search the item described in Attachment A, hereinafter
"the Device." The Device is a black Samsung Galaxy S10 bearing an exterior
International Mobile Equipment Identity ("IMEI") number of 352338107601203.

6.      The applied-for warrant would authorize forensic examination of the
Device for the purpose of identifying electronically stored data particularly described in
Attachment B.

## PROBABLE CAUSE

7.      The DEA, together with partner agencies, has been investigating a subject
known as "Leon Leon" and "Leon" for utilizing a particular Facebook Account
(described for purposes of this affidavit as the "Leon Leon Account"), in the
distribution of illegal controlled substances in the Bangor region. Specifically, the DEA
has developed information that a Boston resident named Alexis De Leon, together with
multiple associates, is using the Leon Leon Account and also cellular telephones to
arrange for the distribution of drugs in eastern Maine. Leon and other individuals are
making short trips from Boston to the Bangor region to distribute drugs and collect
drug proceeds from Maine sub-distributors.

### *Relevant Prior Authority*

8.      On February 7, 2024, the DEA applied for and obtained a search warrant
from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective
location information as to a T-Mobile cellular telephone assigned 917-963-3689 (the
"3689 number"). That application and warrant are attached as Exhibit 1. The affidavit
in Exhibit 1 explains the background of this investigation and the identification of both

the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated herein for purposes of probable cause. On March 7, 2024, the DEA applied for and obtained authority to extend the period of collection as to prospective location information as to the 3689 number. *See* Docket No. 1:24-mj-00070-JCN.

9.      Based on additional information implicating Dianet Soto Sanz as being involved in the Leon DTO, on March 25, 2024, the DEA obtained from this Court a search warrant authorizing collection of prospective location information as to a specific phone number believed to be used by Soto Sanz, in 1:24-mj-00092-LEW (hereinafter the 9629 number). The facts presented in applying for said warrant included the following events:

a.   On February 27, 2024, the DEA requested that Maine State Police Trooper Thomas Pappas stop a particular vehicle, based on physical surveillance and location information received as to the 3689 number. Trooper Pappas stopped the subject vehicle and photographed the following identification cards for the female driver and her two male passengers: (1) Driver: Massachusetts Limited Term Driver's License for Dianet Soto Sanz of Dorchester, Massachusetts; (2) Passenger 1: Expired United States Visa for Ramon Antonio De Leon; (3) Passenger 2: Dominican Republic identification card for Alexis Mariano De Leon. Trooper Pappas did not detect or observe any obvious contraband inside the vehicle but did observe the two male passengers had between them a very large plastic container purporting to be a container for protein powder. He did not otherwise conduct a drug-related investigation and allowed the vehicle to depart a short time after stopping it. Alexis De Leon appeared to be the

individual associated with the 3689 number identified by numerous witnesses as Leon Leon or Leon. Ramon De Leon had been identified as a suspected co-conspirator.

b. On March 2, 2024, location information showed the 3689 again traveled to the Bangor region. On March 5, 2024, I interviewed Jane Doe 4[1] at the Penobscot County Jail in Bangor, Maine. Doe stated that on March 2, 2024, she coordinated the purchase of 300 grams of fentanyl from the Leon Leon Account. Doe stated she met with one Hispanic female and two Hispanic males at a specific restaurant in Bangor on that date and purchased approximately 300 grams of fentanyl for $3,000. Doe positively identified Ramon De Leon as one of the two males whom she purchased the 300 grams of fentanyl from on March 2, 2024.

*Jane Doe 5 Interview & Cooperation*

10.     Based on information received pursuant to authority above, the DEA came to believe that Jane Doe 5 was a customer of Leon, due largely to a significant number of contacts between a phone associated with Jane Doe 5 and the 3689 number.[2] On March 29, 2024, I interviewed Jane Doe 5, who admitted to recently purchasing

---

[1] Jane DOE 4 is currently incarcerated at the Penobscot County Jail on a State of Maine arrest warrant for Failure to Appear.  She has prior a criminal history that includes convictions for Assault.  She is purportedly providing information to law enforcement in exchange for consideration towards a pending Maine State charge of Violation of Conditions of Release.

[2] Jane Doe 5 was already involved in an ongoing ATF investigation involving a January 2024 seizure of drugs and guns from her residence and a nearby camper. Jane Doe 5 had previously been interviewed by the ATF in regards to that investigation and did not at that time disclose any relationship to the Leon DTO. Jane Doe 5 has a significant criminal history, including prior felony convictions in Maine for drug trafficking, thefts, and burglary.

fentanyl from Leon and doing so via communications with the 3689 number. Jane Doe 5 showed communications on her phone which, based on my training and experience, were consistent with her arranging purchases of controlled substances with Leon at the 3689 number.

11.     Following this interview, Jane Doe 5 agreed to perform a controlled purchase of controlled substances from Leon, at the direction of MDEA and DEA. On April 2, 2024, Jane Doe 5 communicated with Leon and coordinated the purchase of approximately 30 grams of fentanyl in Bangor, Maine.  On that date, the GPS ping of 3689 number remained in the Dorchester, MA area while the GPS ping of 9629 traveled from Massachusetts to Bangor, Maine.  Jane Doe 5 was outfitted with a covert audio and video recording device and provided serialized U.S. Currency.  At approximately 12:45 P.M., Agents observed a Massachusetts plated vehicle, registered to Dianet Soto Sanz, arrive to Jane Doe 5's location.  Agents subsequently identified the driver as Soto Sanz, and the passenger as Ramon De Leon.  Jane Doe 5 met with Ramon De Leon in her vehicle and recorded the purchase of approximately 30 grams of suspected fentanyl for $600.00. The suspected fentanyl was retrieved by agents from Jane Doe 5 and she confirmed she had completed the agreed-upon transaction.

*Seizure of Phone from Mandi Ford*

12.     After the above controlled purchase was completed with assistance from Jane Doe 5, surveillance was conducted on the vehicle operated by Soto Sanz as it continued to travel in Bangor.

13.     In the afternoon of April 2, 2024, Agents observed Soto Sanz and Ramon De Leon arrive to 86 Kenduskeag Avenue in Bangor, Maine.  I then observed Mandi

Ford meet with Ramon De Leon and Soto Sanz in the back seat of Soto Sanz' vehicle. Ford was then observed leaving the residence in her own white Fiat sedan.[3]

14.     Agents then coordinated a traffic stop of the white Fiat, which displayed both an expired registration sticker as well as an expired Maine State inspection sticker. During the traffic stop, Bangor Police Officer Brian Cronk subsequently identified Ford as the driver of the vehicle and Steven Libby as the passenger of the white Fiat.

15.     Agents joined Bangor Police Officers on this traffic stop and assisted in searching Ford's vehicle.  Officer Cronk located and seized approximately 51.1 grams of suspected fentanyl in Libby's pocket.  I provided Ford with her Miranda rights, as witnessed by MDEA Agent Dan Gastia, and asked Ford about the fentanyl.  Ford identified a surveillance photo of Ramon De Leon and identified him as "Ramon", and admitted to meeting with Ramon and Soto Sanz on Kenduskeag Avenue prior to the traffic stop.  Ford further admitted to collecting money from Jacob Herbert, Steven Libby, and Gabrielle Izsimone to purchase drugs from Ramon. Ford then showed Agents a text conversation on her phone ("the Device") between herself and the 3689 number. Within the conversation, phone number 3689 identified themselves as "Leon."  The text

---

[3] Mandi Ford had previously confessed to being supplied with controlled substances by the Leon DTO. On February 7, 2024, I had spoken with Mandi Ford while she was incarcerated at the Penobscot County Jail. At that time, in a Mirandized interview, Ford stated she and her boyfriend had been purchasing fentanyl from the Leon DTO. She specifically described Ramon De Leon staying with her and her boyfriend for the purpose of distributing drugs. She provided a photograph on her phone of an immigration document with a photograph of Ramon De Leon. She described obtaining drugs from the Leon DTO for a time period spanning multiple years. For that reason, I believe the Device will likely include relevant evidence spanning a time period well before the date of its seizure in April of 2024. As explained in Exhibit 1, toll records showed the Leon DTO actively communicating with a number of Bangor area subjects by at least October of 2023. Attachment B seeks information, such as messaging, from Ford's phone going back to October 2023.

conversation began on March 22, 2024, and continued through April 2, 2024. In my experience and training, and based on an interpretation of the messages, these messages discussed the distribution of drugs to Ford on April 2, 2024.

16.    Agents concluded the traffic stop by seizing the 51.1 grams of suspected fentanyl and the Device.  Ford and Libby were released pending further investigation and possible future charges.

*Identification of the 9606 Number*

17.    Before the events of April 2, 2024, I had come to believe that the individual utilizing the 3689 number would soon be changing that number. As explained in Exhibit 1, Leon had previously switched phone numbers with his customers, as is common with individuals seeking to avoid law enforcement detection. Jane Doe 5 had also shown me a text message, sent from the 3689 number on approximately March 23, 2024, with the following message: "Greetings, I will change my number tomorrow for security and to take care of myself more I will send you a message with my name Leon tomorrow."

18.    In reviewing Mandi Ford's messages on the Device with the 3689 number, I noted that she had the phone stored as "LNewest," which I noted is consistent with other information that Alexis De Leon changes his number with customers. I also noted that on approximately March 23, 2024, the 3689 sent an identical message to Ford as it had sent to Jane Doe 5, regarding a plan to change the phone number. But the 3689 number had then remained active with Ford until April 2, 2024.

19.    On April 5, 2024, Jane Doe 5 received a message from (207) 735-9606 (the 9606 number) as follows: "Brother, how are you? I'm Leon. This is my new

8

number, brother. I put the Maine number. It's me, Alex." At the direction of agents, Jane Doe 5 messaged the 9606 number regarding an additional purchase of fentanyl. The 9606 number responded: "All right, let me know how for when if for Monday or so."

20.     I noted that, in my experience in this investigation, this manner of communication is consistent with numerous previous messages sent from other accounts associated with the Leon DTO. Additionally, in my experience, it is common for out-of-state drug traffickers to obtain Maine area code 207 phone numbers, in an effort to draw less attention to their phone numbers by drug investigators.

21.     I subsequently confirmed with T-Mobile that the 9606 number is indeed a number with T-Mobile service. I also obtained limited toll records for the 9606 number. The information received from T-Mobile was consistent with the number having been activated recently and, in addition, showed the phone has already been in communication with multiple phone numbers believed to be used by Bangor region customers of the Leon DTO, further confirming the information received on Jane Doe 5's phone.

*Status of Device to be Searched*

22.     The Device is currently in the lawful possession of DEA. It came into the agency's possession as a result of the seizure describe above. I seek this warrant to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws. The Device is currently in storage at an evidence locker at DEA Bangor Post of Duty Office in Hermon, Maine. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent

material to this investigation, in substantially the same state as they were when the
Device first came into the possession of the DEA.

## TECHNICAL TERMS

23.     Based on my training and experience, I use the following technical terms
to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
telephone) is a handheld wireless device used for voice and data
communication through radio signals.  These telephones send signals
through networks of transmitter/receivers, enabling communication with
other wireless telephones or traditional "land line" telephones.  A wireless
telephone usually contains a "call log," which records the telephone
number, date, and time of calls made to and from the phone.  In addition
to enabling voice communications, wireless telephones offer a broad range
of capabilities.  These capabilities include: storing names and phone
numbers in electronic "address books;" sending, receiving, and storing text
messages and e-mail; taking, sending, receiving, and storing still
photographs and moving video; storing and playing back audio files;
storing dates, appointments, and other information on personal calendars;
and accessing and downloading information from the Internet.  Wireless
telephones may also include global positioning system ("GPS") technology
for determining the location of the device.

    b.  Digital camera:  A digital camera is a camera that records pictures as
digital picture files, rather than by using photographic film.  Digital

cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24

11

NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. It is also capable of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

13

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14

27. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: Apr 11 2024

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
*Printed name and title*